FILED

USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE _1_,_26_,_2005_
BY _____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

GERALD BOURG, ET AL                          CIVIL ACTION NO. 00-0622

VERSUS                                       JUDGE DOHERTY

UNION PACIFIC RESOURCES COMPANY, ET AL       MAGISTRATE JUDGE METHVIN

*CONSOLIDATED WITH:*

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

GERALD BOURG, ET AL                          CIVIL ACTION NO. 00-2269

VERSUS                                       JUDGE DOHERTY

UNION PACIFIC RESOURCES COMPANY, ET AL       MAGISTRATE JUDGE METHVIN

## MEMORANDUM RULING

The plaintiffs have filed these consolidated actions asserting both ERISA and state law claims against their former employer for refusing to pay severance benefits after their employer experienced a change in ownership. The plaintiffs seek a "declaration from this court of their rights and entitlements under the Plan . . . and an order directing distribution of benefits under the Plan" along with "a reasonable attorney's fee for the prosecution of this action."[1] The defendants oppose the plaintiffs' claims and seek the dismissal of all claims. After extensive procedural maneuvering, this matter was submitted to this Court for consideration on briefs. For the following reasons, the

---

[1]      Record, Complaint [Doc. 1], at 4, ¶¶ 15-16.

plaintiffs' claims will be denied and this matter dismissed.

I.    **FACTS**

The plaintiffs are: Gerald Bourg, Reid Spangler, Michael Spears, and Jesse Mendoza.  They are former employees of Union Pacific Fuels, Inc. [hereinafter sometimes referred to as "UP Fuels"], a wholly-owned subsidiary of Union Pacific Resources Company [hereinafter sometimes referred to as "UPR"].  During their employment with UP Fuels, the plaintiffs were beneficiaries of a "Terminations and Separation of Employment" benefit program covered by the Employee Retirement Income Security Act of 1974 and sponsored by Union Pacific Resources Group, Inc.

The specific relevant terms of the Plan are:

ADMINISTRATIVE POLICY 2-9
TERMINATIONS AND SEPARATION OF EMPLOYMENT

A.    GENERAL

When an employee is laid off from the Company due to a lack of work situation, the employee is eligible for a separation allowance to be applied as prescribed below.

6.    SEPARATION ALLOWANCE - STAFF REDUCTION

g.  If an employee's termination of employment with the Company occurs as a result of the sale or other disposition of the facility, subsidiary or other business unit for which the employee is working, the employee will be eligible for a separation allowance under this policy only if (1) the employee is not offered employment with the successor employer or any affiliate on substantially similar terms and conditions (including benefits and position level), (2) the employee is offered employment on substantially similar terms and conditions in a different location and the employee refuses relocation as relocation is defined in the UPR Relocation Policy or (3) the employee accepts employment (whether or not substantially similar) with the successor employer or any affiliate and his/her employment is terminated less than one year after the sale or disposition under circumstances that would have entitled the employee to separation

-2-

allowance if he/she had terminated from the Company.

h. The provisions of this policy relating to separation allowance will be administered by the Vice President People, of the Company, who has full authority and discretion to construe and interpret the policy; supply omissions from, correct deficiencies in, and resolve ambiguities in the language of the policy; and resolve all questions (including questions of fact) relating to the eligibility of an employee to receive a separation allowance and the amount, if any, of such severance allowance.[2]

In March, 1999, UPR sold UP Fuels to Duke Energy Field Services, Inc. [hereinafter sometimes referred to as "Duke"]. While the Complaint avers the plaintiffs' employment was terminated "as a result" of the sale to Duke, the allegations do not indicate whether the plaintiffs' separation of employment was made at their choice or was involuntary. With regard to three of the plaintiffs (Gerald Bourg, Reid Spangler, and Jesse Mendoza), the Administrative Record reflects they were offered employment by Duke and they chose not to accept the proffered employment. Michael Spears did accept the position offered by Duke. His new job required he relocate to Houston and it appears he did so. The record does not contain evidence Mr. Spears' employment with Duke has terminated.

The plaintiffs have made claims for severance benefits under the Plan. Demand was made on behalf of Gerald Bourg, Reid Spangler, and Michael Spears by correspondence dated June 22, 1999, and on behalf of Jesse Mendoza on June 30, 1999.[3]  In making these claims, the plaintiffs asserted the offers they had received from Duke were not on "substantially similar terms and

---

[2]      Administrative Record, D 000001, 3-4. The Administrative Record was submitted as an attachment to the defendants' Brief on the Merits [Record, Doc. 118]. The Administrative Record is Bates-stamped D 000001 through D 000486 and will be cited herein as "Administrative Record," followed by the Bates numbers found on the pertinent pages.

[3]      Administrative Record, D 000008-12.

conditions" as those under which they had been working for UP Fuels. Specifically, the plaintiffs argued Duke had offered "substantially lower pay, substantially reduced 401-k and pension benefits, and loss of other benefits."[4]

Approximately three (3) months later, the Vice President - People of UPR, Anne M. Franklin (who was, at that time, the Plan Administrator), issued letters denying the plaintiffs' claims for severance benefits under the Plan.[5] The plaintiffs appealed the denial of the benefits claims, as permitted under the Plan.[6] Ms. Franklin issued a letter denying the appeal on January 13, 2000.[7]

## II. PROCEDURAL HISTORY

The procedural history of this case is complex and, for that reason, requires a brief discussion to establish this Court's prior rulings and the process by which this case wound its way to its current status.

Five plaintiffs (the four named plaintiffs plus Wayne DeHart) asserted ERISA-based claims against UPR and the Plan in the Complaint which was assigned Civil Action No. 00-0622 in this Court. The plaintiffs named the following defendants in their ERISA action:

- UPR, the former owner of UP Fuels; and

- Union Pacific Resources Company Severance Plan [hereinafter sometimes referred to as "the Plan"], the benefits of which the plaintiffs hope to recover.

---

[4]      Administrative Record, D 000008, 11.

[5]      Administrative Record, D 000022-26 (as to the claims of Gerald Bourg, Reid Spangler, and Michael Spears); Administrative Record, D 000027-30 (as to the claim of Jesse Mendoza).

[6]      Administrative Record, D 000031-34, as supplemented by D 000041-45.

[7]      Administrative Record, D 000046-50.

Approximately six months later, the same plaintiffs filed a civil action in the Sixteenth Judicial District Court for the Parish of St. Mary, State of Louisiana asserting therein numerous state law claims which the plaintiffs claimed were not preempted by ERISA. In that action, the plaintiffs named the following defendants:

- UPR;

- Union Pacific Resources Group, Inc. Severance Plan Administrator [hereinafter sometimes referred to as "Plan Administrator"];

- Anadarko Petroleum Corporation, as successor in interest to UPR; and

- Anadarko Energy Services Company, as successor in interest to UPR.[8]

The state court action was removed by the defendants and was assigned Civil Action No. 00-2269. By order of this Court, the two actions were consolidated.[9]

Three significant procedural issues were raised by the parties. The first involved the plaintiffs' state law claims. In addition to the claims asserted in Civil Action No. 00-2269 (the removed action), the plaintiffs filed a Motion to Amend their ERISA Complaint (*i.e.*, the Complaint in Civil Action No. 00-622) to assert state law claims such as those which had been filed in state court. The motion was opposed by the defendants on the ground the proposed amendments would have the effect of asserting claims which were preempted by ERISA. In addition to opposing the amendment sought by the plaintiffs, the defendants moved for summary judgment on all of the state

---

[8]     This Court accepts the plaintiffs' allegation that one or both of the Anadarko entities named as defendants in the removed action is the successor in interest to UPR (an allegation which neither of the Anadarko entities has disputed). For ease of reference, however, this Court will not refer to both "UPR" and "Anadarko"; instead, "UPR" is understood in this Memorandum Ruling to refer to both UPR and its successor(s) in interest, one or both of the named Anadarko entities.

[9]     Record, Order of October 24, 2000 [Doc. 44].

law claims the plaintiffs had asserted in the removed state court action (*i.e.*, in Civil Action No. 00-2269). This Court determined the plaintiffs' claims are controlled by ERISA and the plaintiffs' state law claims were preempted and, on that basis, denied the plaintiffs' Motion to Amend in the ERISA action and granted the defendants' Motion for Summary Judgment on the state law claims asserted in the removed action.[10]

Second, the Administrative Record revealed that one of the plaintiffs, Wayne DeHart, had not actually made a claim with the Plan Administrator for the severance benefits he sought to recover in this action.  Once all parties agreed that this was the case, Mr. DeHart filed a motion to dismiss his claim without prejudice.  The motion was granted by Order of this Court on August 4, 2000.[11] This order had the effect of reducing the number of plaintiffs to the four identified hereinabove.

Third, there was a considerable dispute about the proper scope of the Administrative Record to be used by this Court in reviewing the Plan Administrator's decisions.  In response to the Court's Standing ERISA Order, the defendants originally identified and filed into the record 50 pages of documents they designated as "the Administrative Record."  Defendants later sought to supplement the designated "Administrative Record," however the plaintiffs objected.  The parties' inability to agree as to the proper designation of the Administrative Record prompted the filing of a Motion to Designate Administrative Record by the defendants, extensive briefing by both parties, and a referral of the matter to the Magistrate Judge for the purpose of holding an evidentiary hearing, if necessary, and issuing a Report and Recommendation.  Magistrate Judge Methvin made her report and recommended that the defendants' motion be granted.  This Court considered the plaintiffs'

---

[10]    Record, Memorandum Ruling of March 13, 2001 [Doc. 74].

[11]    Record [Doc. 24].

objections and accepted the recommendation. Judgment designating the Administrative Record as Bates-numbered documents D 000001 through 000486 was entered on June 26, 2002.[12]

The case having finally attained a procedural status where this Court could consider the merits of the plaintiffs' claims, the matter was submitted on briefs. This Court reviewed the parties' initial trial briefs and found that the plaintiffs had not received a "full and fair review" of the denial of benefits by the Plan Administrator.[13] The Plan Administrator – notwithstanding the plaintiffs' request – had violated the requirements of 29 C.F.R. § 2565-503-1(h)(iii) by refusing to produce to the plaintiffs a copy of the entire administrative record upon which the denial of benefits had been based. With this finding, and as the Administrative Record had been properly designated and produced to the plaintiffs at that time, this Court remanded the matter to the Plan Administrator for a full and fair consideration of the entire record and the plaintiffs' appeal. In doing so, this Court denied the plaintiffs' request for attorney's fees; instead, the remedy granted to the plaintiffs for the violation was a "full and fair" consideration of their appeal by the Plan Administrator, in accordance with the regulations.

Upon remand, Catherine L. Atkins, the Manager of Human Resources Services (the person currently designated the Plan Administrator), conducted a review of the plaintiffs' claims. There is no evidence in the record to suggest that, while this matter was on remand to the Plan Administrator, the plaintiffs submitted any new evidence or information or provided any additional briefing to the Plan Administrator in support of their claims.

The Plan Administrator once again denied the plaintiffs' claims and, once her decision was

---

[12]     Record [Doc. 114].

[13]     Record, Memorandum Ruling of November 15, 2002 [Doc. 119].

issued, the parties notified this Court of that fact.[14] For purposes of considering the plaintiffs' appeal

of the Plan Administrator's decision, this Court will consider the most recent decision – that of Ms.

Atkins – as the definitive, final decision concerning the plaintiffs' claims.  In the Final Decision, the

Plan Administrator recited the plaintiffs' right to appeal her decision.  The record contains no

evidence that the plaintiffs sought to appeal Ms. Atkins' denial of benefits, nor any request that the

Court delay briefing on the appeal to this Court in order to allow the exhaustion of administrative

remedies below.  Nonetheless, this Court finds to force another review at this juncture would be

futile and therefore this Court will proceed with consideration of the plaintiffs' claims.[15]

---

[14]      Record, Plan Administrator's Final Decision [Doc. 126] [hereinafter sometimes referred to as "Final Decision"].

[15]      Normally, exhaustion of all administrative remedies must be completed prior to the time that a party may seek review of the denial of benefits under an ERISA plan. McGowin v. Manpower International, Inc., 363 F.3d 556, 559 (5th Cir. 2004).  However, the Fifth Circuit has clearly recognized an exception to the exhaustion requirement in those cases where such exhaustion would constitute a futile act. See Hall v. National Gypsum Company, 105 F.3d 225, 232 (5th Cir. 1997); Denton v. First National Bank of Waco, Texas, 765 F.2d 1295, 1302 (5th Cir. 1985).  Indeed, the Fifth Circuit has quoted with approval the observation by Judge Tjoflat of the Eleventh Circuit that "there are occasions when a court is obliged to exercise its jurisdiction and is guilty of an abuse of discretion if it does not." Hall, 105 F.3d at 232.

      In this particular case, the defendants have not argued that the plaintiffs have failed to exhaust their administrative remedies.  Even had such an argument been made, however, this Court would not require another appeal be exhausted at this point.  Ms. Atkins' review of the plaintiffs' claims was the *third* such review by the Plan Administrator.  While it might be argued the plaintiffs could have sought review of Ms. Atkins' denial to be in strict compliance with the Plan, the record is abundantly clear the plaintiffs have had adequate opportunity to present their claims and evidence in support of their claims, and to identify the theories under which they believe they are entitled to benefits under the Plan.  Moreover, Ms. Atkins' letter indicates she reviewed the entire Administrative Record; as such, she is familiar with the plaintiffs' theories of recovery under the Plan, their complaints about the initial Plan Administrator's reasoning and findings, and their assertions during their initial appeal to Ms. Franklin [Administrative Record, D 000031-34, 41-45].  Therefore, both the plaintiffs and the Plan Administrator have had ample opportunity to consider the entirety of the Administrative Record, the evidence, and each other's positions and to present their own arguments and positions on their disagreement.  An order

This matter now proceeds as a standard ERISA appeal. Full and final briefing[16] has been submitted by the parties and this matter is now before the Court for consideration in this posture.

## III.   APPLICABLE LAW

This Court has ruled the plaintiffs' claims are controlled by the Employees' Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.,*[17] and that the plaintiffs' state law claims are preempted by ERISA.[18]   As such, the plaintiffs' claims are limited to an appeal of the Plan Administrator's denial of their claims pursuant to 29 U.S.C. § 1132(a)(1)(B): "A civil action may

---

requiring yet another "appeal" to the Plan Administrator would serve no purpose other than to delay the final resolution of this matter, which has already gone on for far too long – a delay which, in this Court's view is unnecessary, particularly in light of the consistency of the Plan Administrators' decisions. The Fifth Circuit has decided – in a case where it found futility had not been demonstrated – that there are circumstances under which a court should simply address the merits of the plaintiffs' claims even when administrative remedies have not been exhausted. *See* Denton, 765 F.2d at 1301 n.12 ("This case has already been through two trials prior to this appeal. With the record fully fleshed out in a fashion similar to that which would be provided by an exhaustion of the Plan's administrative remedies, a remand, while undoubtedly the preferred course in the usual case, is appropriate here.").

[16]      The "full and final briefing" in this matter consists of the following: the defendants' "Memorandum in Support of Motion for Complete Summary Judgment" which, at their request, was deemed their trial brief [hereinafter referenced as "Defendants' Trial Brief"] [Record, Doc. 129]; the "Defendants' Brief on the Merits" [hereinafter referred as "Defendants' Initial Brief"] [Record, Doc. 118], together with the Administrative Record, originally submitted as an attachment to the Defendants' Initial Brief, both of which were incorporated by reference into the Defendants' Trial Brief; the plaintiffs' brief entitled "Memorandum in Opposition to Motion for Complete Summary Judgment," which this Court deems a Trial Brief (as a corollary to this Court's agreement to consider the defendants' "motion" as their trial brief) [hereinafter referenced as "Plaintiffs' Trial Brief"] [Record, Doc. 132]; the plaintiffs' "Supplemental Trial Brief" [Record, Doc. 128]; and the plaintiffs' initial Trial Brief filed [hereinafter referenced as "Plaintiffs' Initial Trial Brief"] [Record, Doc. 117], which was incorporated by reference into the Plaintiffs' Trial Brief.

[17]      Record, Memorandum Ruling of March 13, 2001 [Doc. 74], at 5.

[18]      Id. at 8.

be brought by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

"ERISA provides federal courts with jurisdiction to review benefit determinations by fiduciaries or plan administrators." Bratton v. National Union Fire Insurance Company of Pittsburgh, PA, 215 F.3d 516, 521-22 (5th Cir. 2000). "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 521. "When an administrator has discretionary authority with respect to the decision at issue, the standard of review should be one of abuse of discretion." Id. at 521 n.4.

In the case at bar, the language of the Plan is clear the Plan Administrator was given full discretion to interpret the Plan, find the facts applicable to specific claims for benefits, and otherwise administer the plan within her discretion:

> The provisions of this policy relating to separation allowance will be administered by the Vice President People, of the Company, who has full authority and discretion to construe and interpret the policy; supply omissions from, correct deficiencies in, and resolve ambiguities in the language of the policy; and resolve all questions (including questions of fact) relating to the eligibility of an employee to receive a separation allowance and the amount, if any, of such severance allowance.[19]

In view of the unambiguous language of the Plan, this Court will apply the abuse of discretion standard in reviewing the Plan Administrator's decision.

The Fifth Circuit has described the nature of the abuse of discretion review, as applied to the Plan Administrator's factual findings. "When applying the abuse of discretion standard, 'we

---

[19]     Administrative Record, D 000004.

analy[ze] whether the plan administrator acted arbitrarily or capriciously. A decision is arbitrary when made 'without a rational connection between the known facts and the decision or between the found facts and the evidence. An administrator's decision to deny benefits must be 'based on evidence, even if disputable, that clearly supports the basis for its denial.' We must find that '[w]ithout some *concrete evidence* in the administrative record that supports the denial of the claim, . . . the administrator abused its discretion.'" <u>Lain v. Unum Life Insurance Company of America</u>, 279 F.3d 337, 342-43 (5th Cir. 2002) (citations omitted) (emphasis in original).

For review of the Plan Administrator's interpretation of the Plan, the Fifth Circuit has established a specific test. The Fifth Circuit "applies a two-prong test when reviewing an administrator's denial of benefits. First, we determine the 'legally correct interpretation of the [policy].' If it is found that the administrator failed to give the plan 'the legally correct interpretation, [the Court must] then determine whether the administrator's decision was an abuse of discretion.'" <u>Lain</u>, 279 F.3d at 342-44. As to the first prong of the test, "[i]n ascertaining the legally correct interpretation of the policy, we must consider (1) whether a uniform construction of the policy has been given by the administrator, (2) whether the interpretation is fair and reasonable, and (3) whether unanticipated costs will result from a different interpretation of the policy." <u>Id</u>. at 344.

"An administrator . . . is a fiduciary to the extent that he exercises any discretionary authority or control. If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." <u>Id</u>. (citations omitted). "The existence of a conflict is a factor to be considered in determining whether the administrator abused its discretion in denying a claim. The greater the

evidence of conflict on the part of the administrator, the less deferential the abuse of discretion standard will be. Under this 'sliding scale' standard, the court applies the abuse of discretion standard, giving less deference to the administrator in proportion to the administrator's apparent conflict." Id. at 521 n.4.

## IV.   ANALYSIS

As noted above, the Plan clearly grants the Administrator the complete discretion "to construe and interpret the policy; supply omissions from, correct deficiencies in, and resolve ambiguities in the language of the policy; and resolve all questions (including questions of fact) relating to the eligibility of an employee to receive a separation allowance. . . ."[20] As such, the Administrator's constructions of the Plan, interpretation of the Plan, resolution of ambiguities in the language of the Plan, and factual findings will be reviewed for an abuse of discretion. See Bratton, 215 F.3d at 521 n.4.

The briefs filed by the plaintiffs after the Plan Administrator's Final Decision do not include a clearly-articulated list of their complaints about that decision. Nonetheless, this Court has reviewed plaintiffs' final briefing in an effort to ascertain the nature and extent of the plaintiffs' complaints as to the Plan Administrator's decision. Based upon this review, it appears the plaintiffs intend to challenge the following elements of the Plan Administrator's denial of benefits:[21]

---

[20]     Administrative Record, D 000004.

[21]     The only issue the plaintiffs appear to have abandoned is that associated with the insufficiency of the original appeal to Ms. Franklin. As noted above, this Court originally found those issues to be well-founded and remanded the claims to the Plan Administrator for the purpose of conducting a "full and fair" review. As the plaintiffs' briefing after the Final Decision does not specifically re-urge these complaints, this Court assumes the reconsideration meets the regulatory requirements to the plaintiffs' satisfaction.

- the definition of "compensation" used by the Plan Administrator;

- the comparison of the benefits packages offered by Duke and by UP Fuels, both procedurally (*i.e.*, in her choice of a standard of comparison) and substantively (*i.e.*, the two benefits packages were not "substantially similar" and the Administrative Record does not support the Plan Administrator's conclusions); and

- the Plan Administrator's analysis was discriminatory.

The plaintiffs' challenges will be addressed separately below. As an initial matter, however, this Court will address the plaintiffs' claim that the Plan Administrator, as an employee of the sponsoring company, had a conflict of interest and, therefore, breached her duty to administer the Plan solely in the interest of the beneficiaries, as required by ERISA.

The plaintiffs have demonstrated that the Plan Administrator – who is an employee of the company which would be called upon to pay the plaintiffs' claims were she to find in favor of the plaintiffs – has a potential conflict of interest: as Plan Administrator, she is called upon to interpret the Plan in a manner which best benefits the participants and beneficiaries,[22] however it is conceivable her employment could be placed at risk if she were to interpret too liberally the terms of the Plan, thus requiring her employer to pay too many severance benefits. Therefore, there exists a potential for the Plan Administrator to have a conflict of interest in performing her duties as Plan Administrator while remaining an employee of UPR. A plaintiff seeking to substantially impact the amount of deference with which a Plan Administrator's decisions will be viewed must produce evidence to demonstrate the nature and extent of the conflict she experiences. In this case, however the plaintiffs have produced no such evidence. The Fifth Circuit, in considering a record similar to that which exists in

---

[22]     29 U.S.C. § 1104(a).

-13-

this case – *i.e.*, where a conflict theoretically exists but the plaintiffs have provided no actual evidence with respect to the degree of the conflict – has determined that "it is appropriate to review the administrator's decision with only a modicum less deference than we otherwise would."   <u>Vega v. National Life Insurance Services, Inc.</u>, 188 F.3d 287, 301 (5th Cir. 1999) (*en banc*).  Consistent with the Fifth Circuit's conclusions in <u>Vega</u>, this Court will grant to Ms. Atkins' decision a modicum less deference than would be accorded to a Plan Administrator fully independent from UPR.

### A.   Michael Spears[23]

Prior to the sale of UP Fuels to Duke, Mr. Spears was employed by UP Fuels as a Senior Staff Engineer.  He was offered a position with Duke as a General Manager - Operations on the condition he relocate to Houston, Texas.  According to the record, Mr. Spears accepted the new position and relocated to Houston to work for the new company.

The severance benefits granted to UP Fuels employees were to be awarded only under certain circumstances.  One of the circumstances under which severance benefits were *not* due, according to the Plan, was if the employee accepted employment with the new owner and worked for that owner for longer than one year.

> [T]he employee will be eligible for a separation allowance under this policy only if .
> . . (3) the employee accepts employment (whether or not substantially similar) with
> the successor employer or any affiliate and his/her employment is terminated less than
> one year after the sale or disposition under circumstances that would have entitled the
> employee to separation allowance if he/she had terminated from the Company.  An
> employee who remains employed with the successor employer or any affiliate for a
> period of at least one year after the sale or disposition will not be entitled to separation

---

[23]     The facts relating to Michael Spears' application for benefits are substantially different than those relating to the other plaintiffs and, for that reason, Mr. Spears' claim is addressed separately.

allowance under this policy.[24]

Under the explicit language of the Plan, an employee who accepts employment with the successor employer is not eligible for severance benefits, *irrespective of the terms of his new employment,* unless his employment with the new employer is terminated less than one year after the sale or disposition of the business. Thus, in order to demonstrate that he is entitled to benefits under the Plan, Mr. Spears bears the burden of proving that his employment terminated "less than one year after the sale or disposition under circumstances that would have entitled the employee to separation allowance if he/she had terminated from the Company."

A claimant seeking benefits under an ERISA plan bears the burden of proving that he is entitled to benefits under the terms of the Plan. *See* International Association of Machinists and Aerospace Workers, Woodworkers Division, AFL-CIO v. Masonite Corporation, 122 F.3d 228, 231 (5th Cir. 1997); Perdue v. Burger King Corporation, 7 F.3d 1251, 1254 n.9 (5th Cir. 1993). As such, Mr. Spears bore the burden of proving to the Plan Administrators that he was entitled to benefits under the Plan. He bears the same burden before this Court.

The record is undisputed that Mr. Spears accepted Duke's offer of employment in Houston, Texas, but contains no evidence his employment with Duke ended after less than one year. Mr. Spears has had several opportunities to submit evidence into the Administrative Record to meet his burden of proof on this element.

- His claim for benefits under the Plan was filed in June, 1999, approximately three (3) months after the change in ownership, but the letter does not contain any indication that Mr. Spears was no longer working for Duke.

- The Plan Administrator issued her denial letter in September, 1999. Mr. Spears

---

[24]     Administrative Record, D 000004.

appealed the Plan Administrator's decision with a letter dated November 18, 1999,[25] and supplemented his appeal with a letter on January 3, 2000,[26] but no mention is made in either letter that Mr. Spears was no longer working for Duke.

- Ms. Franklin's denial of the plaintiffs' appeal specifically refers to Mr. Spears' acceptance of Duke's offer and that his acceptance had rendered him ineligible for severance benefits: "Thus, if Mr. Spears had refused Duke's offer to relocate, he would have been entitled to benefits under the Plan,"[27] but in Mr. Spears' initial briefing on the merits of his claim, he made no mention whatsoever of any fact or evidence contradicting the Plan Administrator's statement.

- After this Court remanded Mr. Spears' claim to the Plan Administrator for consideration of a full and fair appeal of the original denial of benefits, Mr. Spears had yet another opportunity to submit evidence into the Administrative Record, but no such evidence was presented to the Plan Administrator.

- In her Final Decision, the Plan Administrator explicitly rejected Mr. Spears' claim on the ground that he had accepted employment with Duke,[28] but no mention of this issue appears in Mr. Spears' final briefing to this Court on the merits of his claim.

In short, at no time before the Plan Administrator or this Court has Mr. Spears challenged the factual findings and interpretations that (a) he accepted Duke's offer of employment in connection with the change in ownership of the company; (b) after he accepted the offer with Duke, he was not entitled to severance benefits unless his employment was terminated within one year; and (c) his employment was not terminated within the time limit, therefore, he was not entitled to severance benefits under

---

[25]    Administrative Record, D 000031-34.

[26]    Id., D 000041-45.

[27]    Id., D 000049.

[28]    "Mr. Spears was asked to relocate for his new position. As a result, under the terms of the Plan, he would have been eligible for separation benefits at that time if he would have refused the relocation.  At that time, he had a chance to receive separation benefits, but elected to relocate with Duke and accept the new position.  As a result, he was no longer eligible for 'separation benefits' under the Plan unless Duke terminated him within one year of the sale." Record, Final Decision [Doc. 126], at 6.

-16-

the Plan. In view of Mr. Spears' failure to challenge any of these facts or conclusions, this Court will accept those facts as undisputed.

The clear and explicit language of the Plan denies severance benefits to any employee who accepts employment, under any terms, with a successor employer and who remains employed for one year or longer. There is no evidence in the record to suggest that Mr. Spears' employment with Duke Energy was terminated such that he is entitled to severance benefits under the Plan. As such, the Plan Administrator's findings are based upon evidence in the record, as well as reasonable inferences based upon the available evidence, and her decision rejecting Mr. Spears' claim is legally correct. The Plan Administrator's decision on Mr. Spears' claim reflects, in the words of the Fifth Circuit, that there is a rational connection between the known facts and the Plan Administrator's decision and between the found facts and the evidence." *See* Lain, 279 F.3d at 242-43. This Court finds no abuse of discretion in the Plan Administrator's decision to deny Mr. Spears' claim on the basis that he was not entitled to benefits once he accepted Duke's offer and he did not demonstrate that he had ever left Duke's employ.[29] Mr. Spears' claims arising out of the Plan Administrator's decision denying his claim will be DENIED.

---

[29]     The briefing includes various arguments by Mr. Spears concerning the terms and conditions of the employment offered to him by Duke. However, the plain and specific language of the Plan renders those arguments moot. "[T]he employee will be eligible for a separation allowance under this policy only if . . . (3) the employee accepts employment *(whether or not substantially similar)* with the successor employer or any affiliate *and his/her employment is terminated less than one year after the sale or disposition . . .*" Administrative Record, D 000004 (emphases added). Thus, Mr. Spears' failure to demonstrate that his employment was terminated less than a year after the sale from UPR to Duke not only has the effect of rendering him ineligible to receive severance benefits, it also makes irrelevant any discussion of the terms of the new employment. For this reason, Mr. Spears' arguments concerning "substantial similarity" will not be addressed herein.

## B.    The Remaining Plaintiffs' Claims

The plaintiffs bear the burden of proving the Plan Administrator abused her discretion in concluding they were not entitled to benefits under the terms of the Plan. *See* Dowden v. Blue Cross & Blue Shield of Texas, Inc., 126 F.3d 641, 644 (5th Cir. 1997); Perdue, 7 F.3d at 1254 n.9.  The abuse of discretion standard of review requires that this Court determine, first, whether the Administrator's interpretations and constructions are legally correct and, if legally correct interpretations or constructions were used by the Plan Administrator, whether she abused her discretion in reaching those conclusions upon which her decision is based.

### 1.    The Final Decision

The Plan Administrator's Final Decision is seven (7) pages in length and contains an extensive discussion by the Plan Administrator of her decision-making process and analysis. The letter begins with a section entitled "Summary of Plan Benefits," in which she (a) quotes the relevant portions of the Plan, and (b) lists the seven (7) elements that she considered in making her decision:

(a)    the purpose of the Plan ("to provide benefits to those employees who were adversely financially impacted due to the sale of a business unit to another company") and relevant facts concerning the sale of assets from UPR to Duke as well as Duke's offers of employment to some UPR employees;

(b)    severance benefits were payable only to employees offered a job which was not "substantially similar" to their jobs at UP Fuels;

(c)    Compensation, benefits, and job position were the factors used to compare the terms and conditions under which employees labored at UP Fuels' with those offered by Duke;

(d)    an elaborate formula was created for the purpose of comparing compensation actually received at UP Fuels with that offered by Duke;

(e)    severance benefits would be paid to anyone offered compensation by Duke that was even $1 less than that which had been earned at UP Fuels;

-18-

(f)     the calculation of the claimants' compensation while at UP Fuels; and

(g)     the calculation of Duke's compensation offers to the claimants.[30]

This list is followed by a detailed description of her review of the original Plan Administrator's decision and a more detailed discussion of the task of comparing the three elements of "substantial similarity": compensation, benefits, and job position.  Finally, the Plan Administrator stated her conclusion that the claimants were not entitled to benefits, including the reasons for her conclusion.

## 2.     Compensation

The plaintiffs claim that the Plan Administrator used a legally incorrect definition of the term "compensation" when she evaluated whether the terms and conditions offered by Duke were "substantially similar" to those under which the plaintiffs had been employed with UP Fuels.

The term "compensation" does not appear in the language of the Plan when it discusses "substantially similar" job offers.  The pertinent language glosses over the "compensation" element of the comparison: "the employee will be eligible for a separation allowance under this policy only if (1) the employee is not offered employment with the successor employer or any affiliate on substantially similar terms and conditions (including benefits and position level)."[31]  The Plan Administrator, in accordance with her authority and discretion, concluded that the comparison of terms and conditions was understood to include compensation, therefore, she supplied this omission in the language of the policy, adding "compensation" as the third element to be used in evaluating whether Duke's offer involved "substantially similar" terms and conditions to those under which an

---

[30]     Record, Final Decision [Doc. 126], 1-3.

[31]     Administrative Record, D 000004.

employee was working for UP Fuels. The plaintiffs do not complain of the Plan Administrator's decision to expand the list of factors to be considered by adding compensation to the "benefits and position level" identified in the Plan.

Having supplied the deficiency by adding compensation to the list of factors to consider in determining "substantial similarity," the Plan Administrator then was required to define "compensation." It is this definition to which the plaintiffs object. They argue the term "compensation" should have included various elements that the Plan Administrator chose not to include.

In her Final Decision, the Plan Administrator explained why the particular definition of "compensation" was chosen. She began by discussing the difficulties associated with comparing "compensation" offered by different companies:

> Accepted compensation practice recognizes that companies deliver compensation differently. As a result, when companies compare compensation packages, they look at the total compensation package which includes a combination of (a) base salary, (b) "target" or actual/average short-term incentive compensation, and (c) "target" actual/average long-term incentive compensation. Therefore, a company that provides low base salaries and high bonus "targets" to employees could be providing equivalent "target" total compensation as another company that offers high base salaries and no bonuses.[32]

The Plan Administrator then described the different approaches to compensation used by UP Fuels and Duke and, based upon her understanding, chose to use the following formula for determining "total compensation" for purposes of the severance analysis:

> The factors used to determine whether the total compensation package offered an employee was 'substantially similar' included the following:
>
> UP Fuels:     Base Salary - Used current base salary

---

[32]     Record, Final Decision [Doc. 126], at 4.

Short Term Incentives - Used the following two components:
      a)    The 1997 Alignment Pay ("AP") award that was paid in April, 1998, and
      b)    The Incentive Pay ("IP") award that was paid in April 1998

Long Term Incentives - Used the following two components:
      a)    The combination of stock options and restricted stock received under the Broad-Based Ownership Program ("BBOP") in both 1997 and 1998. Using the Black Scholes method, the stock options were valued at $4.21 per option and the restricted stock was valued at $9.88 per share, and
      b)    Discretionary stock option grants to key individuals made in both 1997 and 1998. The stock option had a were [sic] valued at $5.61 using the Black Scholes method.[33]

Duke:      Base salary - As offered by Duke
              Short Term Incentive - Used the 1999 "target" bonus for each employee's position as provided by Duke
              Long Term Incentive - Used the "target" award level for each employee's position as provided by Duke (Mr. Spears was the only claimant eligible for long term incentive awards).[34]

Having derived the formula by which "compensation" would be calculated under each company's employment terms, the Plan Administrator then decided that "[a]n employee who received a job offer from Duke with an offer of total compensation that was less (even by $1) than the employee's total compensation at UP Fuels would receive a separation allowance," an extremely

---

[33]    The Plan Administrator chose to include two years' of long-term incentive payments made by UP Fuels to its employees. As such, the formula had the potential to inflate the plaintiffs' annual compensation while with UP Fuels. For that reason, the formula is quite generous in defining the "total compensation" paid to UP Fuels employees. The current Plan Administrator recognized this fact: "The former Plan Administrator used the actual grants made by UP Fuels under the BBOP [i.e. the long-term incentive plan] for both 1997 and 1998. This could result in a more favorable calculation of total compensation to the employee since there was the opportunity to receive two 'target' grants, one in 1997 and one in 1998, which would have been higher than the annual 'target' amount." Id., at 4.

[34]    Id. at 2.

generous interpretation of the phrase used in the Plan, "substantially similar."[35]

Using this formula and analysis, the Plan Administrator calculated the plaintiffs' compensation while employed by UP Fuels and compared that total with the compensation the plaintiffs were being offered by Duke, and she reached the following conclusions:

- Mr. Bourg's "total compensation" at UP Fuels was $64,277.00 and his offer from Duke was $66,000.00;

- Mr. Mendoza's "total compensation" at UP Fuels was $59,455.00 and his offer from Duke was $61,600.00; and

- Mr. Spangler's "total compensation" at UP Fuels was $41,990.00 and his offer from Duke was $42,618.00.[36]

In each case, the Plan Administrator found that the total compensation offered by Duke exceeded the compensation the plaintiffs had received from UP Fuels.[37]

The plaintiffs complain that the Plan Administrator's treatment of the term "compensation" constitutes an abuse of discretion because: (a) it assumes that Duke will make incentive payments at the top of their target values; (b) it does not include 401(k) contributions by employers; and (c) it does not include long-term incentive pay earned in 1998 and paid in April, 1999. Each of these objections is addressed in turn.

First, the plaintiffs complain that the Plan Administrator abused her discretion in including the target values of incentive payments offered by Duke when calculating employees' prospective

---

[35]     Id.

[36]     Id. at 2-3. While the plaintiffs disagree with the use of this particular formula, they have not contested the specific numbers used by the Plan Administrator to plug into the formula.

[37]     Id. at 5.

Duke compensation. The plaintiffs claim that such targets are speculative and, therefore, the Plan Administrator was arbitrary and capricious in relying upon them.  This argument relies upon a misreading of the Plan.  The clear language specifically requires that the Plan Administrator evaluate the terms and conditions *offered by* the new owner: "the employee will be eligible for a separation allowance under this policy only if (1) the employee is not *offered employment with the successor employer* or any affiliate *on substantially similar terms and conditions* (including benefits and position level)."[38]  Given the plain language of the Plan, the Administrator was required to consider the terms "offered" by Duke and the plaintiffs have not disputed that the Duke offers included incentive pay at the target levels used by the Plan Administrator in her formula.  Thus, it was not only reasonable for the Plan Administrator to conduct her comparisons using the terms *offered* by Duke, but required by the terms of the Plan.

As to the substance of the plaintiffs' complaint, they are correct that predictions about future payment for future employment are always, and inherently, speculative.  The Plan Administrator nonetheless was required to conduct a good-faith evaluation of Duke's offers to the plaintiffs, and – in the absence of evidence to the contrary, which the plaintiffs neither submitted into the Administrative Record, nor produced to this Court – this Court find she was not unjustified in relying upon the terms offered by Duke in conducting her calculations concerning whether those terms were "substantially similar" to those which had been paid by UP Fuels. To have assumed otherwise without evidence to support such an assumption could, itself, have risked an arbitrary and capricious act on her part.

Moreover, the Plan Administrator could not have rejected the method she used (*i.e.*, using

---

[38]     Administrative Record, D 000004 (emphasis added).

Duke's actual offers, including target incentives) without choosing some other method to use.  The plaintiffs have not identified any other method which would have been more "fair or reasonable" for the Plan Administrator to have used in evaluating Duke's offers.  The mere fact that some people did not meet the threshold for severance benefits does not, in and of itself, demonstrate that the formula used for calculating entitlement to those benefits was not "fair and reasonable."  The plaintiffs' argument to the contrary is unpersuasive.

The second of the plaintiffs' complaints about the Plan Administrator's definition of "compensation" under the Plan is that it does not include 401(k) contributions by employers. Specifically, the plaintiffs argue that the Internal Revenue Service considers employer contributions to 401(k) thrift funds to be "compensation," and, therefore, that the Plan Administrator should have done so as well.  Even assuming the correctness of the plaintiffs' description of the IRS' treatment of employers' thrift plan contributions, however, the plaintiffs do not explain the relevance of this fact, nor why the Plan Administrator should have been bound by tax regulations in applying the terms of the Plan.

This argument is particularly perplexing in that both of the employers at issue (UP Fuels and Duke) made contributions to their employees' thrift plans.  Therefore, the inclusion of thrift contributions would have affected the calculation of "compensation" at both companies.[39]  This Court knows of no way to ascertain whether (or how) the inclusion of employer 401(k) contributions would

_____

[39]     According to the plaintiffs, UP Fuels offered a two-for-one match up to 3% of salary while Duke offered a one-for-one match up to 6% of salary.  Therefore, each package yielded identical benefits if the employee chose to maximize their thrift contributions; however, any contribution at a lesser level than the maximum would yield less of an employer contribution at Duke than at UP Fuels, with a potential defect equal to 3% of salary.  Record, Plaintiffs' Initial Brief [Doc. 117], at 11.

have affected the Plan Administrator's decisions on the plaintiffs' claims, nor have the plaintiffs seen fit to share insight on this point. In the absence of information concerning how much UP Fuels was contributing to the plaintiffs' thrift plans prior to the termination and how much Duke would have contributed, there is no way for this Court to determine whether the plaintiffs would have benefitted had the Plan Administrator adjusted her formula as they ask.

The most problematic aspect of the plaintiffs' suggestion, however, is the incredible complexity such a definition would have brought to the process of defining "compensation." The Plan Administrator would have had to consider a part – but not all – of the thrift program as an element of the "benefit" packages and part as an element of "compensation." Further, because both employers' contributions were linked to choices made by their employees, the plaintiffs' definition would have made "compensation" dependent ultimately upon the employees' elections concerning *their* thrift contributions. Not only would the plaintiffs' definition of compensation have introduced an arbitrary element into the definition by linking it to the employees' independent decisions, but it would not have been possible to conduct the compensation comparison until those who had been offered employment elected the level of thrift contributions they would make at Duke *if* they chose to accept the proffered employment. To say the very least, there is nothing in the Plan which requires the Plan Administrator to introduce such a process into the definition of "compensation."

The Plan Administrator defined "compensation" and derived a formula for calculating compensation in accordance with her definition. Both were consistent with her explanation of the generally-accepted practices for comparing compensation offered by different companies with

different approaches to delivering compensation to their employees.[40] The term "compensation," was supplied by Plan Administrator to address an omission in the plain language of the Plan (a decision well within the discretion granted to her under the terms of the Plan), and her discretion extended to providing a definition of the term she supplied. The plaintiffs have not demonstrated that the definition of "compensation" adopted by the Plan Administrator was legally incorrect, nor have they shown that she was arbitrary and capricious in the factual findings that underpinned the definition she chose. The plaintiffs' arguments that the definition of compensation is unfair or unreasonable are not persuasive, particularly in light of the significant degree of deference this Court must pay to the Plan Administrator's decisions. This Court finds the Plan Administrator did not adopt a legally incorrect definition of compensation nor abuse her discretion in adopting the definition of "compensation" reflected in her Final Decision.

### 3.    Benefits

The plaintiffs have objected to the standard of comparison employed by the Plan Administrator in the context of fringe benefits offered by Duke and by UP Fuels, as well as to her conclusion that the two benefits packages were "substantially similar."  Each argument will be addressed separately.

> i.    *The plaintiffs argue that the Plan Administrator should have used the same standard of compensation for benefits as she used for compensation.*

The Plan grants severance benefits to employees terminated as a result of the sale or other disposition of the subsidiary by which they are employed if "the employee is not offered employment

---

[40]    The plaintiffs have not challenged the Plan Administrator's discussion of generally accepted practices in any way.

with the successor employer or any affiliate on *substantially similar terms and conditions (including benefits and position level).*[41]   The Plan does not contain a definition of the term "substantially similar," nor does it provide guidance to the Administrator as to how to determine whether terms and conditions are "substantially similar." As such, the Plan leaves the resolution of these questions to the discretion of the Plan Administrator, who has the "full authority and discretion to construe and interpret the policy, supply omissions from, correct deficiencies in, and resolve ambiguities in the language of the policy."[42]

In her Final Decision, the Plan Administrator explained that she interpreted "substantially similar" in the context of compensation to mean any offer of even $1 less than that paid by UP Fuels.[43]   Therefore, any offer from Duke that did not include compensation that was equal to, or greater than, that earned by the employee at UP Fuels would not meet the definition of "substantially similar" compensation. The plaintiffs complain that this very generous definition should have been used by the Plan Administrator when comparing the benefits packages offered by the two companies, and that the failure to use the same definition is legally incorrect and constitutes an abuse of discretion.

For the purpose of comparing the benefits packages offered by the two companies, the Plan Administrator concluded that a dollar-for-dollar standard of comparison would not be used in considering the benefits packages offered by Duke and by UP Fuels. In the Final Decision, the Plan Administrator explained the difficulties associated with comparing fringe benefits packages among

---

[41]     Administrative Record, D 000004 (emphasis added).

[42]     Id.

[43]     Record, Final Decision [Doc. 126], at 2.

different companies and the generally-accepted method for conducting such comparisons:

> Accepted practice for determining the value of benefits recognizes that companies also deliver the value of the benefit packages differently.  As a result, in comparing the benefit program of one company to another, you must look at the benefit program in the aggregate.  This is now the human resources profession evaluates and compares benefit packages between companies and is also the accepted practice on how comparisons are done in acquisitions and divestitures.  Benefits typically include, but are not limited to retirement benefits, savings and 401(k) benefits, health, life, accident, disability benefits, and time off benefits.  Companies always retain the right to change their benefit programs at any time.  In addition, companies may terminate benefit programs or an individual at any time, which may affect that employee's future accruals in the benefit plans.[44]

In accordance with her understanding of accepted practices, as well as the difficulties of conducting such comparisons, the Plan Administrator compared the two programs in the aggregate.

The plaintiffs argue that the Administrator did not use the same standard of comparison in both contexts (compensation and benefits) and, therefore, that the standard used in the benefits context was legally incorrect.  The plaintiffs clearly are correct that the Plan Administrator used a different definition of "substantially similar" to evaluate compensation as opposed to the benefits packages.  The defendants do not deny this fact, and it is plain on the face of the Plan Administrator's Final Decision that she did so.  The plaintiffs are incorrect, however, that analysis ends with this conclusion.

The Fifth Circuit test for the legal correctness of a Plan Administrator's interpretation requires that this Court consider three factors: "(1) whether a uniform construction of the policy has been given by the administrator, (2) whether the interpretation is fair and reasonable, and (3) whether

---

[44]    Record, Final Decision [Doc. 126], at 6.

unanticipated costs will result from a different interpretation of the policy." Lain, 279 F.3d at 344.[45]
The question this Court must consider is whether the decision to interpret "substantially similar"
differently, in the two contexts of this Plan, is fair and reasonable under the circumstances of this
case.  Clearly it was both fair and reasonable, and it is the differences in the natures of the two
concepts which justify differences in treatment.

Compensation involves salary and bonuses actually paid to employees, the direct transfer of
funds from one party to another.  The amounts are written and concrete, and the value of the
compensation is certain on the face of the documentation.  Fringe benefits, on the other hand, consist
of perquisites the employer makes available, but that the employee is not required to accept or
participate in, such as insurance coverage, pension and thrift plans, paid time off, etc., and which do
not involve the direct transfer of sums from employers to employees.  The specific monetary value
of fringe benefits varies as to each employee (both from the perspective of the employer and the
employee), and  is dependent upon many variables.

Aside from insisting that the Plan Administrator, in effect, compare apples and oranges using
a standard that is not adapted to the differences between them, the plaintiffs' argument (if accepted
by the Plan Administrator) would, as a practical matter, have rendered the process extraordinarily
difficult.  The plaintiffs have suggested – and they are correct – that a standard of comparison
requiring knowledge of the dollar value of each element of each benefit plan would have required an
actuarial study (or input by a similar type of expert) of the two benefits packages. Such a study would

---

[45]         Neither party has made any argument, nor submitted any evidence regarding the
third factor (*i.e.*, unanticipated costs associated with an alternative interpretation).  Therefore, this
Court has no basis for evaluating this factor and assumes that the parties agree it has no role to
play in this matter.

have had to take into account the various options and choices available to employees under the various programs (*e.g.,* as to the health insurance program, there would have been different values for employee-only coverage, for the employee-and-spouse coverage, and for the family coverage; as to the life insurance program, the various levels of life insurance coverage available; etc.). This Court has no doubt that such a study would have been both time-consuming and expensive. There is no basis in the Plan for finding that such an onerous process of comparison was intended, or required, by the phrase "substantially similar."

Finally, the application of such an actuarial study to the employees for the purpose of ascertaining whether Duke's benefits package was of equal or greater value than UP Fuels' package would have been perceived – by everyone to whom severance benefits were denied, as a result – as unfair and unreasonable because it would have resulted in different answers for different employees, depending upon the details of each person's employment and life circumstances. For instance, the value of Duke's benefits package to a new, single employee who chooses to participate in few of the benefits plans might be very different than the value of the very same package to an employee of many years who seeks substantial insurance coverage, and thrift and pension benefits to protect his family. Thus, the same benefits package offered by Duke could, in the context of one type of employee, be "substantially similar" to the one offers by UP Fuels while other categories of employees might find the Duke package less valuable than that offered by UP Fuels.

The Plan Administrator's obligation was to construe "substantially similar" in a legally correct manner. For the purpose of comparing benefits packages offered by UP Fuels and by Duke, the Plan Administrator determined that "substantially similar" required only that she look at the two plans in the aggregate. This conclusion was consistent with her understanding of accepted practice among

-30-

human resources professionals. Her construction of the phrase, as applied to the benefits packages offered by the two companies, involved identifying the most significant elements of both plans and conducting an aggregate comparison to see whether UP Fuels employees would lose significant benefits if employed by Duke. While this construction of "substantially similar" was different from that used in the context of comparing "compensation" by the two companies, the plaintiffs have not demonstrated that this construction was unfair or unreasonable, nor that the factual findings which underpinned her decision were arbitrary or capricious, particularly in light of the significant degree of deference this Court must pay to the Plan Administrator's decisions.

For the reasons described hereinabove, this Court finds that the Plan Administrator's decision to apply the term "substantially similar" in this manner did not constitute a legally incorrect interpretation nor, an abuse of her discretion..

> ii.     *The plaintiffs argue that the two benefits packages were not "substantially similar" because the benefits offered by UP Fuels were substantially better than those offered by Duke.*

The plaintiffs complain that the Plan Administrator is wrong in concluding that Duke's benefits package was "substantially similar" to that offered by UP Fuels. The Plan Administrator described her comparison of the two benefits packages:

> After a thorough analysis, I have determined that UP Fuels and Duke offered substantially the same benefit plans. Both Duke and UP Fuels offered competitive medical, dental, life, accidental death and dismemberment, disability, thrift/savings, pension and time off benefits. Although there were differences between individual benefit plans and costs varied slightly from plan to plan, on the whole, the UP Fuels and Duke benefit plans were "substantially similar." On an individual plan basis, one may be able to argue that a specific UP Fuels plan may have been better than specific Duke plan, or depending on an employee's age and service with UP Fuels, an employee may have been able to argue that at a specific time in their career, that they were slight "better off" under one of UP Fuels specific plans than Duke's specific plan. One could equally argue that a specific Duke plan was better than a specific UP

Fuels plan.  However, in looking at the benefit plans in the aggregate, I conclude that the benefits package offered by the two companies are "substantially similar."[46]

Thus, the Plan Administrator analyzed both benefits packages and concluded that they were "substantially similar" because both plans offered competitive medical, dental, life, accidental death and dismemberment plans, disability, thrift/savings, pension, and time off benefits.  The Plan Administrator noted that a point-by-point comparison of the elements of the two plans revealed that some were more valuable in the form offered by UP Fuels and some were more valuable in the form offered by Duke.[47]  While this conclusion did render the two benefits packages not-identical, they did not change the Plan Administrator's conclusion that they were substantially similar.

The plaintiffs argue that the Plan Administrator should have (a) found that Duke's benefits program was not substantially similar based upon differences in the "retirement payments, the retiree health benefits, the 401-k plan contributions, vacation, retention bonus, relocation benefits, and others,"[48] and (b) not assumed that benefits would be offered in future as they existed at the time the employment offers were made.  Each of these arguments will be addressed in turn.

As to the former argument – that the Plan Administrator was wrong in concluding that the two

---

[46]     Record, Final Decision [Doc. 126], at 6.

[47]     A cursory comparison of the medical insurance plans offered by the two companies (both of which were PPO plans) reveals just a few of these differences: a single employee would pay a contribution of $192 toward his medical coverage at Duke while the same single employee would pay $312 at UP Fuels, an outcome that seemingly favors the Duke benefits program in value to the employee; on the other hand, a family contribution under the Duke plan required a contribution of $1,488 by the employee while the contribution for the same level of medical coverage at UP Fuels was $1,063, an outcome that seems to favor the UP Fuels plan. Similarly, the co-payments required under the UP Fuels are more expensive than under Duke's plan, while deductibles are higher under the Duke plan than for UP Fuels.  *See* Administrative Record, D 000399.

[48]     Record, Plaintiffs' Initial Brief, at 11.

benefits packages were "substantially similar" – the plaintiffs' entire argument consists of the following:

> The record does contain specific information, providing by the claimants, to show that in each employees case, the benefits analysis was different, and that in each case, specific comparable benefits were less favorable, including retirement payments, retiree health benefits, 401-k plan contributions, vacation, retention bonus, relocation benefits, and others. (Def. Response to ERISA Case Order, Appendix, p. D 000032-33).

> The terms and conditions of employment with Duke included substantially reduced 401-k and pension benefits, and the loss of other benefits. The Duke Pension Plan retirement payments are substantially less than UPR, and do not contain provision for medical and hospitalization insurance. (Bates D 000024 - D 000025).

> The Duke 401-K plan benefits are substantially less. UPR offered a possible benefit of "two for one" match, up to 3% of salary; Duke offered "one for one" match up to 6% of salary. . . . Vacation benefits are Duke (four weeks) are substantially less than at UPR (six weeks). (Bates D 000032).

> Duke did not offer comparable stock options; medical, dental, and health care; dependent care. Life insurance, ADD, disability benefits, educational assistance, TRASOP, and "reduction in force" benefits. (Bates D 000032).[49]

The Court notes that all of the citations in the quoted text are to plaintiffs' appeal letter dated November 18, 1999 (which was *not* accompanied by evidence supporting their claims) [D 000031-34], or to the Plan Administrator's initial decision (in which factual findings are precisely the opposite of those for which it is cited).

As the quoted segments demonstrate, the plaintiffs' argument consists exclusively of bare, unsupported statements that the facts upon which they rely are true. The briefing does not contain proper citation to evidence in the record supporting their conclusory statements, nor do they contain citations to admissions by the defendants that these factual statements are true, nor do they identify

---

[49]    Record, Plaintiffs' Initial Brief [Doc. 117], at 11-12.

any other basis upon which this Court could rely to find in their favor that the benefits packages offered by UP Fuels and by Duke were not "substantially similar." A party who bears the burden of demonstrating certain facts in order to prevail on their claims cannot meet that burden merely by declaring that the necessary facts exist. Proof requires evidence and the plaintiffs have neither produced evidence (either to this Court or to the Plan Administrator) that the claimed differences in the two benefits programs exists, nor have they provided this Court with any guidance whatsoever as to whether such evidence might already be contained within the record. Thus, the plaintiffs' argument is not persuasive; as a threshold matter, plaintiffs have not provided this Court with any evidentiary basis upon which to evaluate their factual statements.

This Court notes however, that the defendants' briefing in support of the Plan Administrator's decision is similarly conclusory:

> While Plaintiffs may dislike the Plan and Plan Administrator's identification of compensation components and may believe that the Plan and Plan Administrator should have compared each benefit provided to UP Fuels' employee with each benefit available through Duke and subjectively concluded whether any one of Duke's benefits were more or less valuable to any one particular employee or family (an impossible task to be sure), Plaintiffs were in no position to dictate the manner in which the Plan Administrator arrived at the aggregate benefit conclusions or compensation components . . . .[50]

The briefing from both parties, thus, being almost devoid of substantive support and, therefore, of little substantive value, this Court conducted a full review of the entire Administrative Record to ascertain whether it contains any evidence of which the Plan Administrator could have based her decision. The Record contains extensive documentation describing the Duke benefits

---

[50]    Record, Defendants' Trial Brief [Doc. 129], at 14.

program,[51] extensive documentation describing the UP Fuels benefits program,[52] and a document

entitled "Comparison of Benefits, UPR vs. Duke."[53] The plaintiffs have not challenged the contents

of any of these documents, nor cited the documents in their briefing.

The Comparison appears to reference information derived from the documentation regarding

the two companies' benefits programs.  The information contained in the Comparison supports the

Plan Administrator's statements that competitive benefits were offered by both companies in the eight

(8) major categories she compared; that neither plan was absolutely superior to the other because each

had strengths the other did not; that, as a result, they were "substantially similar"; and that the

differences concerning other categories of benefits were not so substantial as to change her

conclusion.

Finally, the plaintiffs argue that the Plan Administrator should not have assumed that benefits

offered by Duke at the point in time when the employment offer was made would continue to be

offered in the future.  However, the Administrator expressly disavows making the assumption

---

[51]     Administrative Record, D 000071-148.

[52]     Id., D 000149-395.

[53]     Id., D 000396-401. The Administrative Record contains two copies of the
Comparison. The first is identified as D 000396-98, seems to be dated December 8, 1998, and
contains unidentified handwriting. The second is identified as D 000399-401 and seems to be
dated March 22, 1999. This Court has conducted a review of both documents and they seem to
be identical except for the handwriting on the first copy, and the different date stamps in the
lower left-hand corner of each document. The Plan Administrator has not indicated which of
these documents (if either) she relied upon in concluding that the benefits packages offered by
Duke and UP Fuels were substantially similar. However, the content of the documents seems to
provide evidentiary support for the statements made by the Plan Administrator in her denial
letter.

plaintiffs argue: "Companies always retain the right to change their benefit programs at any time."[54] Thus, the plaintiffs' argument on this point is wholly without merit. Moreover, the plaintiffs do not explain (i) why such a presumption would constitute an abuse of discretion; (ii) the role that such a presumption did, would, or should have (or have not) played in the Plan Administrator's analysis; (iii) the effect they believe the presumption had on the conclusion the Plan Administrator reached; (iv) why this complaint is relevant because, logically, any assumption the Plan Administrator made concerning the longevity of the benefits programs would apply equally to both companies; nor (v) any alternative assumption they believe the Plan Administrator should have used to be "fair and reasonable."

The Plan Administrator compared the benefits programs offered by UP Fuels and by Duke as she was required to do by the Plan. The Administrative Record includes a document entitled "Comparison of Benefits" which presents a side-by-side comparison of all of the elements of the benefits programs offered by UP Fuels and by Duke. The plaintiffs have not demonstrated that the Plan Administrator's conclusions are legally incorrect, nor that her factual findings were arbitrary and capricious. The plaintiffs' arguments are unpersuasive, particularly in light of their failure to cite this Court to relevant evidence to support their argument. This Court finds the Plan Administrator did not abuse her discretion in finding that the benefits plans were "substantially similar."

> iii.  *The plaintiffs argue that the Administrative Record does not contain any information from which the Plan Administrator could have reached the conclusion that the two benefits packages were "substantially similar."*

In the Plaintiffs' Initial Brief, they made several suggestions that the Plan Administrator's

---

[54]   Record, Final Decision [Doc. 126], at 6.

decision was not supported by information contained within the Administrative Record:

> The administrative record filed by the defendant contains no information or facts from which the plan administrator could make any rational, non-arbitrary decision as to whether the plaintiffs were offered substantially similar fringe benefits by UPR's successor.
>
> The initial claim determination contains only the unsupported conclusion of the administrator as to the comparable benefits.
>
> The decision by the claims administrator on appeal confirms that no actual analysis of the comparable benefits was made by the administrator
>
> [T]here is no information in the record to support what the administrator calls its 'informed judgment' that the plans were 'in the aggregate' comparable. Without an analysis by a benefits actuary, the administrator's conclusion is nothing more than a guess, and is therefore arbitrary.[55]

The plaintiffs continued this argument in their Final Brief:

> Neither brief submitted by UPR identifies any specific comparative data or analysis in the record which supports the administrator's decision regarding benefits. It must be presumed that none exists, and none existed when the initial decision was reached in 1999, or on appeal in 2000, or on remand in 2003.[56]

This Court can only assume these statements are founded upon the plaintiffs' presumption that

(a) the Plan Administrator was required – notwithstanding her wide discretion as defined in the Plan

– to ascertain whether the Duke benefits plan was worth "even $1 less" that of UP Fuels and (b) the

only way to achieve this end was to procure an actuarial study. Under the plaintiffs' theory, the

absence of an actuarial study could argue that the Administrative Record is bereft of evidence

supporting the conclusion argued by plaintiffs. However, again plaintiffs' arguments are fatally

flawed. The Plan Administrator was not, necessarily, required to procure an actuarial study in order

---

[55]    Record, Plaintiffs' Initial Brief [Doc. 117], at 10-11.

[56]    Record, Plaintiffs' Trial Brief [Doc. 132], at 2.

to compare the two benefits programs. Given the clear language of the Plan, plaintiffs' argument is ill-founded and not persuasive.

The Administrative Record contains over 70 pages of documents describing Duke's benefits package, almost 250 pages of documents describing UP Fuels' benefits package, and a Comparison of Benefits, UPR vs. Duke, which contains two columns describing each variable particular to each element of the two companies benefits packages. The Administrative Record clearly contains evidence upon which the Plan Administrator could have relied to reach her decisions.

### 4.    Discrimination against the Plaintiffs

Two of the plaintiffs, Messrs. Bourg and Spangler, allege the Plan Administrator's decision discriminated against them, but does not clearly articulate a *legal basis* for their claim. Rather, they complain that the Plan Administrator chose to include long-term incentive pay earned in 1996 and 1997 (which was paid in April, 1997 and April, 1998, respectively), but not to include long-term incentive pay earned in 1998 and paid in April, 1999.[57]  Messrs. Bourg and Spangler were not employed by UP Fuels until 1998. As such, their "compensation" was not enhanced by incentive payments received during the previous two years. They argue the formula used by the Plan Administrator for deriving "total compensation" paid by UP Fuels discriminates against them and, for that reason, constitutes an abuse of discretion.

Plaintiffs' argument overlooks the fact that all choice and discrimination among employees is not violative of the law or violative of the specific Plan. Nonetheless, this Court notes the Plan

---

[57]    Presumably, this decision affected the outcome of the compensation comparison as applied to Messrs. Bourg and Mr. Spangler; however, once again, the plaintiffs have not chosen to provide actual information or evidence to either the Plan Administrator or to this Court against which this presumption could be tested. Therefore, it remains a presumption and an article of faith on the part of this Court.

-38-

Administrator did not address this claim by the plaintiffs in her Final Decision. Therefore, she has not provided this Court with an explanation for why she chose to include 1996 and 1997 long-term incentive payments, but not 1998 payments. Morever, the defendants once again have not provided evidence or explanation of Mrs. Atkins' action. In such circumstances, this Court is required to "scour" the Administrative Record, looking for possible support for the Plan Administrator's decision.[58]

In conducting an independent review of the Administrative Record, this Court has discovered the following: the sale of assets from UP Fuels to Duke was completed in March, 1999 and UP Fuels' employees 1998 incentive bonuses were paid the following month, in April, 1999. The Plan Administrator was undoubtedly required to conduct the calculations associated with severance benefits *prior to* the transfer of ownership to Duke in March, 1999. Presumably, it was necessary that the employees have an opportunity to decide whether to accept Duke's employment offers *prior* to the transfer so that Duke would know which employees would continue working after ownership was transferred. Under these circumstances – where the transfer of ownership *pre-dated* the payments at issue – it is reasonable that the Plan Administrator did not incorporate those future payments into her compensation calculations. Thus, the Administrative Record reveals a legal basis justifying the Plan Administrator's decision.

There is no evidence in the record to suggest the Plan Administrator intentionally defined "compensation" for the purpose of discriminating against Messrs. Bourg and Spangler, nor anyone else whose entitlement to severance benefits was impacted by the choice of which years' incentive

---

[58]    Lain, 279 F.3d at 346 ("To find an absence of abuse of discretion, [this] court must scour the record and the pleadings for any legal basis upon which the administrator could have based [its] interpretation[]").

compensation to include, and which to exclude, from the definition of "total compensation." It is in the nature of such decision-making that some elements will be included, some will be excluded, and a cutoff must be established. Those decisions necessarily will have impact on some employees but not others. Had the Plan Administrator chosen to include long-term incentive payments made in 1999, but not those in 1998 or 1997, other employees might have been impacted negatively. The Plan Administrator is authorized to make such decisions and has the full discretion to do so. In the absence of some evidence that she did so with the intent to harm specific individuals, she operated within the realm of discretion granted to her by the Plan and no abuse of that discretion has been shown.

## C.    Reconsideration of Remedy for Regulatory Violations

As noted above, this Court ruled on November 14, 2002 that the Plan Administrator's refusal to produce the entire Administrative Record to the plaintiffs in a timely manner constituted a violation of 29 C.F.R. § 2565-503-1(h)(iii). In order to remedy the violation, this Court ordered the remand of the plaintiffs' claims to the Plan Administrator for a "full and fair" appeal process consistent with the requirements of ERISA and the Code of Federal Regulations. At that time, this Court rejected the plaintiffs' request that the Plan Administrator be ordered to pay penalties and attorney's fees, pursuant to 29 U.S.C. § 1132(c)(1)(B), for her refusal to produce the Administrative Record as required by law. In so doing, this Court noted that "neither party had directed the Court to Fifth Circuit jurisprudence interpreting the statute and regulation at issue" concerning the question of penalties and attorney's fees for violation of the pertinent provisions.[59]

The plaintiffs' Supplemental Trial Brief is directed solely at "rectify[ing] th[e] shortcoming"

---

[59]    Record, Plaintiff's Supplemental Trial Brief [Doc.128], at 1, *quoting*, Memorandum Ruling of November 14, 2002.

noted by this Court in the Memorandum Ruling of November 14, 2002. The plaintiffs' Supplemental Trial Brief properly identifies and quotes the pertinent statutory and regulatory provisions and demonstrates the propriety of this Court's previous conclusion that the Plan Administrator was clearly wrong in refusing to produce the entire Administrative Record to the plaintiffs after her initial denial of benefits. However, with regard to this Court's decision not to award monetary damages in the form of attorney's fees and costs, the plaintiffs have not identified any error in this Court's analysis or understanding of the facts; they have not argued that this Court has abused its discretion in refusing to award sanctions and attorney's fees; and they have not brought new facts to this Court's attention concerning the application of this Court's discretion to this matter.  In short, while the briefing does address the question of the Fifth Circuit's jurisprudence on the issue, it has not identified any basis for this Court to reconsider its earlier decision.  The jurisprudence clearly declares that prejudice is *not* a requirement for awarding sanctions pursuant to 29 U.S.C. § 1132(g)(1), but that it *is* appropriate for a court to consider the lack of prejudice in refusing to award penalties.[60]  This Court considered the lack of prejudice, combined with the remedy of a full and fair appeal process, sufficient to remedy the defendants' regulatory violation, and that conclusion has not changed.

As none of the facts this Court considered in its earlier decision appear to have been in error, and as the Fifth Circuit's jurisprudence appears to provide explicit support for this Court's earlier decision, this Court declines to reconsider its denial of the plaintiffs' request for the award of penalties and attorney's fees.

---

[60]    *See* Godwin v. Sun Life Assurance Company of Canada, 980 F.2d 323, 327 (5th Cir. 1992); Parish v. Profit Sharing Plan for Employees of Howard B. Wolf, Inc., 637 F.2d 357, 362 (5th Cir. 1981).

## CONCLUSION

For the foregoing reasons, the appeal of the Plan Administrator's denial of benefits to Michael

Spears, Gerald Bourg, Reid Spangler, and Jesse Mendoza shall be denied and their claims dismissed.

THUS DONE AND SIGNED in Chambers, Lafayette, Louisiana, this ⟨25⟩ day of January,

2005.

REBECCA F. DOHERTY
UNITED STATES DISTRICT COURT

-42-